IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 04-464 |
| WILLIAM JONES | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Patrick L. Meehan, United States Attorney for the Eastern District of Pennsylvania, and William L. Inden, Special Assistant United States Attorney, respectfully submits this sentencing memorandum in the above captioned matter.

I.   INTRODUCTION

Defendant William Jones has pled guilty to a 14-count indictment, charging him with seven counts of making false statements to a federal firearms licensee, in violation of Title 18, United States Code, Section 924(a)(1)(A), and seven counts of possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1), all arising from defendant's paying another person to purchase a total of 11 firearms on his behalf from October 16, 2001 through March 13, 2002. The firearms were all purchased from Mike and Kate's Sports Shop, a federal firearms licensee located at 7492 Oxford Avenue in Philadelphia.

II.   OFFENSE CONDUCT

From October 16, 2001 through March 13, 2002, William Jones, who had a prior federal conviction for conspiracy to illegally engage in firearms dealing, paid Annette Cooke to falsify federal documents and purchase a total of 11 firearms on his behalf, which Jones then re-

sold to a drug dealer by the name of "Jose." The firearms were all purchased from Mike and Kate's Sports Shop, a federal firearms licensee located at 7492 Oxford Avenue in Philadelphia. In order to complete the above transactions, Cooke was required to complete and sign Firearms Transaction Records (ATF Forms 4473). On each of the forms Cooke answered "Yes" when questioned if she were the actual buyer of the firearms. She also signed each form at the bottom of a printed warning that she was committing a felony if she were not the actual buyer of the firearms.

On March 13, 2002, the day of the last purchase, members of the Firearms Trafficking Task Force received information regarding suspicious firearms purchases by Cooke and as a result set up surveillance of Mike and Kate's Sports Shop. They observed Cooke enter the store and meet with the owner, then leave and get into a blue minivan that was driven by an individual later identified as defendant Jones. Police stopped the minivan to identify the occupants, and shortly thereafter Jones dropped Cooke off a few blocks from her home. Jones told Cooke to keep the firearm with her this time and he would get it later, because he was concerned about being followed by the police.

Special Agent James Redding then stopped Cooke on the street and requested to speak with her. Cooke gave a statement indicating that she had purchased the firearms from Mike and Kate Sports Shop for "Will," whom she later identified as the defendant Jones. In exchange, the defendant would pay her in cash for the weapons. The weapon purchased earlier that afternoon was confiscated by law enforcement.

The next day Jones was interviewed. He was advised of his Miranda rights and signed the form stating that he had been so advised. Jones then admitted to police that he had

"Annette" purchase firearms for him, but claimed he only had her purchase five guns for him – two after Christmas 2001, two at the end of January 2002, and the last incident when Annette was arrested, on March 13, 2002. Based on Jones's prior convictions, he is prohibited from purchasing or being in possession of any firearm.

### III.     SENTENCING

#### A.     Statutory Maximums

The maximum sentence that may be imposed on defendant on each of counts 1 through 7 is 10 years imprisonment, 3 years supervised release, a $250,000 fine, and a $100 special assessment. The maximum sentence that may be imposed on defendant on each of counts 8 through 14 is 5 years incarceration, 3 years supervised release, a $250,000 fine, and a $100 special assessment. The total maximum sentence defendant faces is 105 years incarceration, 3 years supervised release, $3,500,000 fine, and a $1400 special assessment.

#### B.     Sentencing Guidelines Calculation

The Government acknowledges the appropriateness of the sentencing guidelines calculation as outlined in the PSR, that is, a combined offense level of 22 on all counts, which includes all the enhancements outlined in the report. Nonetheless, the Government takes the position that the defendant should be subject only to a 2-level upward adjustment pursuant to U.S.S.G. § 2K2.1(b)(1)(A), instead of the 4-level upward adjustment pursuant to U.S.S.G. § 2K2.1(b)(1)(B) contemplated by the PSR. The government and the defendant stipulated to that result when the defendant entered his guilty plea, and the government stands by its position.[1]

---

[1] See United States v. Jones: Guilty Plea Agreement, paragraph 8(a). As noted in the addendum to the Presentence Report, the defendant has objected to a 4-level upward adjustment pursuant to U.S.S.G. § 2K2.1(b)(1)(B), despite having pled guilty to counts which involved a

With this adjustment, the defendant has a combined offense level of 20 on all counts. Because the defendant is entitled to 3 points for his acceptance of responsibility, his total offense level is reduced to 17. The government agrees with the defendant's criminal history calculation as detailed in the PSR, which indicates a score of 3 and a Category II. Defendant's final guidelines are therefore 27 to 33 months.

    C.    **The Defendant Did Not Provide Substantial Assistance**

Although the plea agreement in this case contemplated the possibility of a substantial downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance in the investigation of other matters, the defendant never cooperated enough to warrant a motion for such a departure. The defendant's sentencing was continued several times in an effort to give the defendant the opportunity to provide useful information, and each time he was told what was required of him. Nonetheless, the defendant was unable to provide the agent with whom he was working any actionable information.

**IV.**    **THE EFFECT OF BOOKER**

The government urges that the Court impose a sentence within the final guideline range.

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a

---

total of 11 guns. The defendant has taken the position that he should receive only a 2-level upward adjustment pursuant to U.S.S.G. § 2K2.1(b)(1)(A) because the defendant has admitted to and the parties have stipulated to his having only been responsible for 5 guns. The government supports the defendant's position.

mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury.  As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory."  Booker, 125 S. Ct. at 757.  This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction.  The sentence will be subject to review by the Court of Appeals for "unreasonableness."  Id. at 765.

In the wake of Booker, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed.  As is plainly set forth in Booker, the Guidelines sentence is not to be based solely on facts found by a jury beyond a reasonable doubt.  See United States v. Crosby, 397 F.3d 103, 115 (2d Cir. 2005) ("a sentencing judge would . . . violate section 3553(a) by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range, as required by subsection 3553(a)(4), based on the facts found by the court."); see also United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) (Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth Amendment will not impede a sentencing judge from finding all facts relevant to sentencing.  The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guidelines sentence.").  Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767; see also United States

5

v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("[t]he applicable Guidelines range is normally to be determined in the same manner as before Booker/Fanfan.").[2]

The Third Circuit has affirmed the trial court's authority, following Booker, to determine the appropriate Guideline range under the preponderance-of-the-evidence standard. In remanding a case for resentencing, where the original sentence had been applied before Booker was decided, the Court stated:

> We . . . note that the District Court is free to engage in precisely the same exercise in judicial fact finding as it did in February 2003, so long as such fact finding is consistent with Booker. Cf. United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir.2005) ("The error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system.").

United States v. Miller, 2005 WL 1791999, at *4 (3d Cir. July 29, 2005).

---

[2] The courts of appeals have generally stated that the proper sentencing procedure after Booker is for the district court first to calculate the Guidelines sentence and then to consider the other factors listed in 18 U.S.C. § 3553(a). See, e.g., Crosby, 397 F.3d at 111, 112 ("In order to fulfill this statutory duty to "consider" the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range. * * * . Once an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, along with all of the factors listed in section 3553(a)."); United States v. Hughes, 396 F.3d 374, 378-79 (4th Cir. 2005) ("Consistent with the remedial scheme set forth in Booker, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."). As noted below, the government submits that the factors in Section 3553(a) have, to a large extent, been taken into account by the Sentencing Commission in its development of the Sentencing Guidelines, and that even a separate accounting of these factors should, in all but the most exceptional case, result in a sentence within the Guidelines range. Cf. Mares, 402 F.3d at 519 (noting that if a sentencing judge exercises discretion to impose a sentence within the Guidelines range, the appellate court on review "will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines" and it will be "rare" for a reviewing court to say the sentence is unreasonable).

The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 744 (same) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of nearly 20 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing, and should occur absent unusual circumstances. Since Booker, the courts of appeals have emphasized the continued importance of the Sentencing Guidelines. As the Second Circuit Court of Appeals explained in United States v. Crosby, "These principles change the Guidelines from being mandatory to being advisory, but it is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Crosby, 397 F.3d at 113. The Court of Appeals for the Fifth Circuit also noted in Mares, "Even in the discretionary sentencing system established by Booker/Fanfan, a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines, which are designed to guide the judge toward a fair sentence while avoiding serious sentence disparity." 402 F.3d at 518-19. See also United States v. Paladino, 401 F.3d 471, 480 (7th Cir. 2005) ("Under the new sentencing regime the judge must justify departing from the guidelines, and the justification has to be reasonable.").

A recent decision of the Seventh Circuit in defining the new sentencing regime is instructive. That court stated:

> The Sentencing Guidelines represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses. When the Supreme Court directed the federal courts to continue using the Guidelines as a source of advice for proper sentences, it expected that many (perhaps most) sentences would continue to reflect the results obtained through an application of the Guidelines. But "many or most" sentences cannot mean "all" sentences. Put differently, Booker does not hold that a Guidelines sentence must conclusively be presumed to be reasonable. . . .
>
> But while a per se or conclusively presumed reasonableness test would undo the Supreme Court's merits analysis in Booker, a clean slate that ignores the proper Guidelines range would be inconsistent with the remedial opinion. As Booker held, "the district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker, 125 S.Ct. at 767. The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country. "The Sentencing Commission will continue to collect and study [district court] and appellate court decisionmaking. It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices." Id. at 766. The best way to express the new balance, in our view, is to acknowledge that any sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness. . . .
>
> The defendant can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the factors set forth in § 3553(a).

United States v. Mykytiuk, 2005 WL 1592956, at *1-2 (7th Cir. July 7, 2005).

The government also commends to the Court's attention the scholarly opinion in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005), which agreed that, absent unusual circumstances, a sentence should be imposed within the Sentencing Guidelines range. In his assessment in Wilson, on the day after Booker was decided, Judge Cassell explained at length the reasons supporting this view. As he stated, the Guidelines represent the product of an expert commission, which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences which carry out the purposes defined by

9

Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to Congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912.[3]

The United States submits that a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. As the Fifth Circuit stated in Mares,

> If the sentencing judge exercises her discretion to impose a sentence within a properly calculated Guideline range, in our reasonableness review we will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines. Given the

---

[3] In United States v. Ranum, 353 F. Supp. 2d 984 (E.D. Wis. 2005), Judge Adelman rejected Judge Cassell's approach, claiming that it is "inconsistent" with the holdings in Booker. The government respectfully disagrees with Judge Adelman's approach. As Judge Cassell noted in a subsequent opinion in United States v. Wilson, 355 F. Supp. 2d 1269 (D. Utah 2005), the Ranum approach ignores the "carefully calibrated" work of the Commission in determining which offender characteristics determine a sentence. Id. at 1275. Moreover, Ranum gives insufficient consideration to the importance of consistent sentencing and avoiding sentencing disparities. As Judge Cassell recognized, "only close adherence to the Guidelines offers any prospect of treating similarly-situated offenders equally," and thus assuring fidelity to the manifest Congressional purpose. Id. Moreover, the opinion of the Wisconsin court appears inconsistent with later decisions of its governing Court of Appeals, the Seventh Circuit, as noted above.

>deference due the sentencing judge's discretion under the Booker/Fanfan regime, it will be rare for a reviewing court to say such a sentence is "unreasonable."

402 F.3d at 519.  The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.  Cf. id. (noting that "[w]hen the judge exercises her discretion to impose a sentence within the Guideline range and states for the record that she is doing so, little explanation is required," but when the judge gives a non-Guideline sentence, "she should carefully articulate the reasons she concludes that the sentence she has selected is appropriate for that defendant" because "[s]uch reasons are essential to permit this court to review the sentence for reasonableness as directed by Booker.").

In this case, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

V.	**GOVERNMENT'S RECOMMENDATION**

As discussed above, with an offense level of 17 and a criminal history category of II, the defendant falls within the sentencing range of 27 to 33 months incarceration. The government respectfully recommends that the Court impose a period of incarceration within this Guidelines range. Such a sentence would recognize the seriousness of the defendant's offense conduct, the defendant's prior conviction for a similar offense, and the fact that he was still under supervision when he committed these crimes.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney

_____
William L. Inden
Special Assistant United States Attorney

Dated: _____

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by United States first class mail on the following counsel:

Gerald Stein, Esquire
2727 Centre Square West
1500 Market Street
Philadelphia, PA 19102

_____
WILLIAM L. INDEN
Special Assistant United States Attorney

Dated: _____